**THIS OPINION IS A PRECEDENT
OF THE T.T.A.B.**

Mailed:
May 6, 2008

# UNITED STATES PATENT AND TRADEMARK OFFICE
_____

## Trademark Trial and Appeal Board
_____

The H.D. Lee Company, Inc.
v.
Maidenform, Inc.
_____

Opposition No. 91168309
to application Serial No. 78487064
filed on September 21, 2004
_____

Paul J. Kennedy of Pepper Hamilton LLP for The H.D. Lee Company, Inc.

Jennifer A. Prioleau, Esq. for Maidenform, Inc.
_____

Before Rogers, Cataldo, and Bergsman, Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

Maidenform, Inc. filed an intent-to-use application for the mark ONE FAB FIT, in standard character format, for goods ultimately identified as "foundation garments, panties, brassieres, underwear, briefs, body briefers, body suits, shapewear, girdles, camisoles, women's undergarments, and women's intimate apparel namely, sleepwear, lingerie, and slippers" (Serial No. 78487064). Applicant disclaimed the exclusive right to use the word "fit."

The H.D. Lee Company, Inc. opposed the registration of applicant's mark on the ground of priority of use and

likelihood of confusion under Section 2(d) of the Trademark Act of 1946, 15 U.S.C. §1052(d). Specifically, opposer alleged that applicant's mark is likely to cause confusion with opposer's previously used mark ONE TRUE FIT for "clothing, namely, non-leather coats, shorts, shirts, blazers, non-leather jackets, skirts, jeans, and pants."[1] Applicant denied the essential allegations in the notice of opposition.[2]

Evidentiary Issues

A. <u>Applicant's objection to the documents introduced during opposer's testimony deposition of Elizabeth Cahill and to the documents introduced through opposer's notice of reliance</u>.

Applicant objected to all of the documents introduced by opposer during the testimony deposition of Elizabeth Cahill, as well as all of the documents introduced through opposer's notice of reliance, except Exhibit A,[3] on the ground that opposer failed to produce the documents in response to applicant's discovery requests.[4] Applicant contended that "Opposer failed to respond to Applicant's

---

[1] Opposer also alleged that the registration of applicant's mark will cause dilution of opposer's famous mark ONE TRUE FIT, but presented no arguments in support of that claim in its brief. We therefore deem opposer to have waived its pleaded dilution ground, and we have given it no consideration.

[2] As an "affirmative defense," applicant alleged that there is no likelihood of confusion. That allegation is not an affirmative defense; rather, it is an amplification of applicant's defense to opposer's likelihood of confusion claim.

[3] Exhibit A is a certified copy of Registration No. 2893915 for the mark ONE TRUE FIT showing current status and title in opposer.

[4] Applicant's Brief, p. 3.

discovery requests and thus there is no substantial justification as to why Opposer did not produce one single document in response to Applicant's discovery requests,"[5] and that "[a]ll of Opposer's exhibits in its trial Testimony Deposition of Ms. Cahill as well as the exhibits in Opposer's Notice of Reliance were within the scope of documents requested by Applicant."[6]  In that regard, applicant referenced only one interrogatory requesting that opposer "[i]dentify the documents upon which Opposer intends to rely in connection with this opposition proceeding."[7] Applicant did not attach to its brief copies of any interrogatories, document requests or the responses thereto.

In support of the admissibility of the documents introduced during its testimony period, opposer set forth the relevant prosecution history of this opposition:

1. During the discovery period, each party served written discovery;

2. While the parties discussed settlement, they consented to extensions of time to respond to outstanding discovery;

---

[5] Applicant's Brief, pp. 4-5.
[6] Applicant's Brief, p. 5.
[7] Applicant's Brief, p. 5 n.1.

3.   The discovery period closed without a settlement and without either party having served responses to outstanding discovery;[8]

4.   Applicant refused to reopen discovery to allow the parties to respond to the outstanding discovery requests;[9] and,

5.   Neither party filed a motion to compel discovery before the close of discovery.[10]

Although opposer did not respond to applicant's discovery, opposer argued that its testimony and evidence is admissible because applicant did not file a motion to compel discovery, citing TBMP §523.04 ("if a party that served a request for discovery receives a response thereto which it believes to be inadequate, but fails to file a motion to test the sufficiency of the response, it may not thereafter be heard to complain about the sufficiency thereof"); TBMP

---

[8] In fact, during the two-month period scheduled between the close of discovery and the opening of trial, neither party responded to outstanding discovery requests and neither party filed a motion to compel responses.

[9] During its testimony period, opposer filed a motion to extend testimony periods to allow the parties time to serve responses to outstanding discovery, and it filed a motion to compel discovery. Applicant in its opposition briefs did not contest the fact that neither party served responses, or that applicant refused to reopen discovery to permit the parties time to serve their responses. However, we note that the mere close of discovery did not preclude either party from subsequently serving responses to interrogatories, document requests, or requests for admission.

[10] Opposer's Reply Brief, pp. 1-2. A motion to compel does not need to be filed prior to the close of discovery, but it must be filed prior to the opening of the first testimony period. Trademark Rule 2.120(e)(1), 37 CFR §2.120(e)(1). Opposer did not file a motion to compel until after the opening of its testimony

§527.01(e)(2004 rev. 2004) ("A party that responds to a request for discovery by indicating that it does not have the information sought, or by stating objections thereto, may be barred by its own action from later introducing the information sought in the request as part of its evidence on the case"); and, *inter alia, Chianti Ruffino Esportazione Vinicola Toscana S.p.A. v. Colli Spolenti Spoletoducale SCRL,* 59 USPQ2d 1383, 1383 (TTAB 2001) ("Any deficiencies in applicant's discovery responses should have been addressed by the timely filing of a properly-supported motion to compel discovery prior to the commencement of opposer's testimony period"); *Linville v. Rivard,* 41 USPQ2d 1731, 1733 (TTAB 1996) (because respondent's objections "were not of a nature which would have led petitioner to believe that no such documents existed, and because petitioner failed to file a motion to compel, petitioner cannot now [during trial period] be heard to complain that the documents were not identified and produced").[11]

We agree with opposer. By failing to serve any response to applicant's discovery requests, opposer in no way led applicant to believe that there were no documents responsive to its requests. If applicant was unsatisfied with opposer's failure to respond to its discovery requests,

---

period, which was contested by applicant. Opposer's motion to compel was denied as untimely. Board's April 2, 2007 Order.
[11] Opposer's Reply Brief, pp. 4-7.

it was required to file a motion to compel discovery, failing which applicant waived its right to object to such testimony and evidence on the ground that it was not produced during discovery. In this situation, applicant's own inaction ensured that applicant would not see opposer's evidence for the first time until trial. Under such circumstances, applicant cannot claim unfair surprise.

Also, because applicant failed to provide copies of the specific discovery requests to which opposer failed to respond, we cannot judge whether those discovery requests sought the documents that were later introduced as opposer's evidence. *Kohler Co. v. Baldwin Hardware Corp.,* 82 USPQ2d 110, 1005 (TTAB 2007).[12]

---

[12] As indicated *supra,* applicant did reference Interrogatory No. 28 as one reportedly requiring opposer to "[i]dentify the documents upon which Opposer intends to rely in connection with this opposition proceeding." However, the Board has held that a party does not need to specify the evidence it intends to present in support of its case [*Polaroid Corporation v. Opto Specs, Ltd.,* 181 USPQ 542, 543 (TTAB 1974)] and does not need to identify its witnesses in advance of trial [*American Optical Corporation v. Exomet, Inc.,* 181 USPQ 120, 124 (TTAB 1974]. Accordingly, there is no basis for imposing an estoppel sanction because opposer failed to respond to the referenced interrogatory. *Charrette Corp. v. Bowater Communication Papers Inc.,* 13 USPQ2d 2040, 2041 (TTAB 1989). We add that many rules governing Board *inter partes* cases were amended November 1, 2007 and the rules now provide for certain disclosures during discovery and certain pre-trial disclosures. The amended rules, however, apply only to cases commenced on or after November 1, 2007.

Finally, we note that applicant, like opposer, did not respond to its adversary's discovery requests. In fact, applicant would not consent to extend testimony and reopen discovery to allow the parties to exchange discovery responses, and opposed opposer's motion to compel the production of discovery responses.[13] Subsequently, during its testimony period, applicant introduced testimony and evidence that was purportedly requested in opposer's discovery, but not produced by applicant. Under such circumstances, applicant will not be heard to complain that opposer's testimony and evidence is not admissible because it was not produced during discovery, but that applicant's testimony and evidence is admissible even though it also was not produced during discovery. *Cf. Miss America Pageant v. Petite Productions Inc.,* 17 USPQ2d 1067, 1069 (TTAB 1990) ("a party ordinarily will not be heard to contend that a request for discovery is proper when propounded by the party itself but improper when propounded by its adversary") and the cases cited therein.

In view of the foregoing, applicant's objection to opposer's exhibits is overruled.

---

[13] Trademark Rule 2.120(a)(3) provides that "[d]iscovery depositions must be taken, and interrogatories, requests for production of documents and things, and requests for admission must be served, on or before the closing date of the discovery period as originally set or as reset." Accordingly, responses to written discovery may be served after the close of discovery.

B.  Whether applicant's right to tack its earlier use of the mark ONE FABULOUS FIT was tried by implied consent.

During the testimony deposition of Sally Skidmore, applicant's Vice President of Marketing and Advertising, applicant introduced testimony, supported by exhibits, that it has continuously used the mark ONE FABULOUS FIT for panties, bras, and camisoles since 2001.  During the deposition, opposer objected to the introduction of exhibits regarding the use of the mark ONE FABULOUS FIT on the ground, *inter alia,* that "the document is irrelevant as it does not refer to the trademark that is the subject matter of this opposition proceeding."[14]  In its reply brief, opposer renewed the objection, arguing that applicant's attempt to tack the use of ONE FABULOUS FIT onto ONE FAB FIT was not pled in applicant's answer, and it was not tried by implied consent.[15]

An affirmative defense is defined as follows:

> A defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true.[16]

---

[14] Skidmore Dep., p. 26.  The same objection was made for all of the exhibits introduced during the Skidmore deposition.
[15] Applicant's Reply Brief, pp. 10-11.
[16] Black's Law Dictionary, p. 430 (7th ed. 1999); and "An answer may contain any defense, including the affirmative defenses of unclean hands, laches, estoppel, acquiescence, fraud, mistake, prior judgment, or any other matter constituting an avoidance or affirmative defense."  Trademark Rule 2.106(b)(1).

"[A]n unpleaded defense cannot be relied upon by the defendant unless the defendant's pleading is amended (or deemed amended), pursuant to Fed. R. Civ. P. 15(a) or 15(b), to assert the matter." TBMP §§311.02 and 314 (2nd ed. rev. 2004). The reason for requiring an affirmative defense to be pleaded is to give the plaintiff notice of the defense and an opportunity to respond.[17]

Except where the opposer pleads and proves its ownership of a prior registration, in order to prevail in an opposition based upon a Section 2(d) claim of likelihood of confusion, the opposer must prove that it has prior rights in the term it relies upon to demonstrate likelihood of confusion as to source. *See: Otto Roth & Co. v. Universal Foods Corp.,* 640 F.2d 1317, 209 USPQ 40, 43 (CCPA 1981); *Antillian Cigar Corp. v. Benedit Cigar Corp.,* 218 USPQ 187, 188 (TTAB 1983); and *Fluid Energy Processing & Equipment v. Fluid Energy, Inc.,* 212 USPQ 28, 35 (TTAB 1981). Where, as here, applicant effectively denied opposer's allegation of prior use, opposer must prove that element of its claim. However, "tacking" is a defense that must be pleaded to put opposer on notice of new matter that applicant is placing at issue (*i.e.,* a mark previously used by applicant that is the

---

[17] *Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation,* 402 U.S. 313, 350 (1971).

legal equivalent of applicant's opposed mark, and that provides the basis for applicant to claim prior use).

In the case before us, applicant did not plead as an affirmative defense that it would rely on its use of the mark ONE FABULOUS FIT for bras, panties, and camisoles to prove its first and prior use of the mark ONE FAB FIT. Mere denial by applicant of opposer's allegation of priority of use is sufficient to put opposer on notice that it must prove its pleaded priority, but it is insufficient to put opposer on notice that any priority opposer will attempt to prove will have to predate the priority that applicant will attempt to prove through tacking. Because applicant may not rely on an unpleaded defense, we must determine whether applicant's attempt to tack its use of ONE FABULOUS FIT onto ONE FAB FIT was tried by implied consent.

> Implied consent to the trial of an unpleaded issue can be found only where the nonoffering party (1) <u>raised no objection to the introduction of evidence on the issue, and</u> (2) was fairly apprised that the evidence was being offered in support of the issue.

(Emphasis added). TBMP §507.03(b). *See also Long John Silver's Inc. v. Lou Scharf Inc.,* 213 USPQ 263, 266 n.6 (TTAB 1982) (applicant's objection to the introduction of evidence regarding an unpleaded issue obviated the need to determine whether the issue had been tried by implied consent); *Boise Cascade Corp. v. Cascade Coach Co.,* 168 USPQ

795, 797 (TTAB 1970) ("Generally speaking, there is an implied consent to contest an issue if there is no objection to the introduction of evidence on the unpleaded issue, as long as the adverse party was fairly informed that the evidence went to the unpleaded issue").

Because opposer objected to the testimony and argument regarding applicant's use of the mark ONE FABULOUS FIT, applicant's attempt to tack the use of that mark onto ONE FAB FIT was not tried by implied consent. In view thereof, opposer's objection to applicant's testimony and evidence regarding applicant's use of the mark ONE FABULOUS FIT is sustained, applicant's answer is not deemed to be amended, and therefore the facts and arguments regarding applicant's use of the mark ONE FABULOUS FIT will be given no consideration. Accordingly, because applicant did not submit evidence of its use of ONE FAB FIT prior to the filing date of its intent-to-use application, the earliest priority date on which applicant may rely is the filing date of its application (September 21, 2004). *Larami Corp. v. Talk To Me Programs Inc.,* 36 USPQ2d 1840, 1844-1845 (TTAB 1995 (owner of an intent-to-use application may rely on its application filing date as a constructive use date for purposes of priority); *Zirco Corp. v. AT&T,* 21 USPQ2d 1542, 1544 (TTAB 1992).

11

## The Record

By operation of Trademark Rule 2.122, 37 CFR §2.122, the record includes the pleadings and the application file for applicant's mark. The record also includes the following testimony and evidence:

A. Opposer's Evidence.

    1. Notice of reliance on the following items:

        a. A certified copy of Registration No. 2893915 for the mark ONE TRUE FIT for "clothing, namely, non-leather coats, shorts, shirts, blazers, non-leather jackets, skirts, jeans, and pants." The certified copy of the registration shows that the registration is currently subsisting and that ownership is in the opposer; and,

        b. Copies of 79 articles from printed publications that reference the mark ONE TRUE FIT; and,

    2. The testimony deposition of Elizabeth Cahill, the Vice President of Marketing and Communications for Lee Jeans, a licensee of opposer, with attached exhibits.

B. Applicant's Evidence.

    1. Notice of reliance on the following items:

      a.   A copy of the application for the mark ONE

          FABULOUS FIT from the Trademark Office

          database;

      b.   Copies of 52 third-party registrations

          consisting in part of the word "fit" for

          clothing; and,

      c.   Dictionary definitions of the words "fit,"

          "fabulous," "true," and "one"; and,

2.   The testimony deposition of Sally Skidmore, applicant's Vice President of Marketing and Advertising, with attached exhibits.

## Standing

Even though opposer's registration for the mark ONE TRUE FIT (Registration No. 2893915) issued on October 12, 2004, prior to the December 28, 2005 filing of the notice of opposition, opposer did not plead ownership of a registration for its mark ONE TRUE FIT.  However, opposer alleged ownership of the underlying application (Serial No. 78211086).  At trial, opposer introduced a certified copy of its registered mark showing the current status of the registration and title in opposer's name.  Applicant did not object to the certified copy of the registration.  Under these circumstances, we deem the notice of opposition amended to include opposer's registration.  Because opposer's registration is of record, it has established its

standing to oppose the registration of applicant's mark. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000); *Lipton Industries, Inc. v. Ralston Purina Co.*, 213 USPQ 185, 189 (CCPA 1982). In any event, opposer has shown that it has a real interest in this proceeding by proving that it has used its mark ONE TRUE FIT for jeans, shorts, capris, pants, jackets, tops, tank tops, camisoles, skirts, shirts, coats, and blazers.[18] *Lipton Industries, Inc. v. Ralston Purina Co.*, 213 USPQ at 189.

Priority

Because opposer's registration has been made of record, Section 2(d) priority is not an issue with respect to the goods identified in opposer's registration. *King Candy Co. v. Eunice King's Kitchen, Inc.*, 496 F.2d 1400, 182 USPQ 108, 110 (CCPA 1974); *B.V.D. Licensing Corp. v. Rodriguez*, 83 USPQ2d 1500, 1506 (TTAB 2007). In any event, opposer's underlying application for registration was filed on February 5, 2003, prior to the September 21, 2004 filing date of applicant's application. *See* Section 7(c) of the Trademark Act of 1946, 15 U.S.C. §1057 (the filing of an application to register a mark constitutes constructive use of the mark, conferring a right of priority against any other person).

---

[18] Cahill testimony, pp. 17 and 24.

As noted above, Ms. Cahill testified that opposer has been continuously using the mark ONE TRUE FIT in connection with a wide variety of clothing products, including camisoles. Camisoles are listed in applicant's description of goods, but not that of opposer's registration. Therefore, priority is in issue with respect to camisoles, and thus opposer must prove that it used its mark ONE TRUE FIT on camisoles prior to September 21, 2004, the filing date of applicant's application.

Ms. Cahill testified that opposer has been continuously using the mark ONE TRUE FIT since June 2003 without, however, identifying any specific products. Subsequently, during cross-examination, she identified the goods on which the mark was used.[19]

> Q. What types of goods are sold in connection with the One True Fit mark?
>
> A. Jeans, shorts, capris, pants, jackets, tops, tank tops, camisoles, skirts.
>
> Q. Any coats?
>
> A. Yes, coats.
>
> Q. Blazers?
>
> A. Yes.
>
> Q. Shirts?
>
> A. Yes.

---

[19] Cahill Dep., p. 17 (direct examination) and pp. 176-178 (cross examination).

15

Q.  Does Lee still use the One True Fit mark in connection with these goods?

A.  Yes.

Q.  Has Lee continuously used the One True Fit mark in the United States since the date of first use?

A.  Yes.[20]

On cross-examination, Ms. Cahill identified the products on which opposer was currently using the mark ONE TRUE FIT,[21] but never specifically testified that opposer's use of the mark ONE TRUE FIT in connection with camisoles had been continuous since June 2003. In fact, she testified, "the usage on camisoles and tank tops [was] an expansion of the original product line."[22]

In all of opposer's exhibits there are only two references to camisoles, but opposer's ONE TRUE FIT mark was not used to directly identify them.[23] Opposer's Exhibit 16 is the "Misses Fall '05 Shirts Catalog." The cover features two of opposer's logos: LEE RIVETED and design and LEE JEANS SINCE 1889 in a red oval over ONE TRUE FIT. Camisoles are featured on page 20 of the catalog. That page displays the LEE JEANS SINCE 1889 in a red oval logo without the ONE TRUE FIT trademark.

---

[20] Cahill Dep., p. 24.
[21] Cahill Dep., pp. 176-178.
[22] Cahill Dep., p. 27.
[23] Cahill Dep., Exhibits 16 (a Fall 20005 catalog at OTF00191) and 19 (a Spring 2006 shirts catalog at OTF00244).

Opposer's Exhibit 19 is the "Spring 2006 Misses Shirts" catalog. Two logos are displayed in the lower right-hand corner of the cover: LEE JEANS SINCE 1889 in a black oval over ONE TRUE FIT and LEE in a black rectangle. Camisoles are displayed on an unnumbered page with the LEE JEANS SINCE 1889 in a black oval logo without the ONE TRUE FIT mark.

Ms. Cahill's oral testimony is not specific enough with respect to camisoles, and it is without any corroborating documentary evidence, to persuade us that opposer used its mark ONE TRUE FIT in connection with camisoles prior to the filing date of applicant's application. "Oral testimony, if sufficiently probative, is normally satisfactory to establish priority of use in a trademark proceeding." *Powermatics, Inc. v Globe Roofing Products Co.,* 341 F.2d 127, 144 USPQ 430, 432 (CCPA 1965). In this case, we do not find the testimony and evidence sufficient to meet opposer's burden of proof that it had used the mark ONE TRUE FIT in connection with camisoles prior to the filing date of applicant's application.

## Likelihood of Confusion

Our determination under Section 2(d) is based on an analysis of all of the probative facts in evidence that are relevant to the factors bearing on the issue of likelihood of confusion. *In re E. I. du Pont de Nemours & Co.,* 476 F.2d 1357, 177 USPQ 563, 567 (CCPA 1973). *See also, In re*

*Majestic Distilling Company, Inc.,* 315 F.3d 1311, 65 USPQ2d 1201, 1203 (Fed. Cir. 2003). In any likelihood of confusion analysis, two key considerations are the similarities between the marks and the similarities between the goods. *See Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 192 USPQ 24, 29 (CCPA 1976) ("The fundamental inquiry mandated by §2(d) goes to the cumulative effect of differences in the essential characteristics of the goods and differences in the marks").

A.    The similarity or dissimilarity and nature of the goods.

Opposer has registered its mark for "clothing, namely, non-leather coats, shorts, shirts, blazers, non-leather jackets, skirts, jeans, and pants." Applicant, on the other hand, has applied to register its mark for "foundation garments, panties, brassieres, underwear, briefs, body briefers, body suits, shapewear, girdles, camisoles, women's undergarments, and women's intimate apparel namely, sleepwear, lingerie, and slippers."

Opposer argued that the products of the parties are related because they are clothing products, and all such products are related.[24] In addition, opposer contended that

---

[24] Opposer's Brief, p. 17 ("all of the goods listed in the application for Applicant are subsumed into Lee's ONE TRUE FIT® registration by virtue of the fact that such articles are either closely related in the field of 'clothing' . . .or, in fact, synonymous for the article of clothing, e.g., 'shirts' and

"where Lee . . . and Maidenform are major players in the apparel industry, no consumer would be surprised to see any of the goods associated with Maidenform's ONE FAB FIT Mark offered in connection with Lee's ONE TRUE FIT® Mark."[25] On the other hand, applicant argued that the products are not similar or related because applicant's products are undergarments while opposer's products are outerwear.[26]

We begin our analysis of the similarity or dissimilarity and nature of the goods by noting that the facts in each case vary and the weight to be given each factor may be different in light of the varying circumstances; therefore, there can be no rule that certain goods (*e.g.,* all clothing products) are *per se* related, such that there must be a likelihood of confusion from the use of similar marks in relation thereto. *See B.V.D. Licensing Corp. v. Rodriguez,* 83 USPQ2d at 1506; *In re Shoe Works,* 6 USPQ2d 1890, 1891 (TTAB 198) (women's shoes and men's, women's and children's shorts and pants); *In re British Bulldog, Ltd.*, 224 USPQ 854, 855-56 (TTAB 1984) (shoes and men's underwear). Nor will the Board take judicial notice that items of outerwear and undergarments are related items for purposes of determining likelihood of confusion. *B.V.D.*

---

'camisoles'. . . [applicant] has conceded that its products are 'apparel' and 'clothing.'").
[25] Opposer's Brief, p. 18.
[26] Applicant's Brief, pp. 20-21.

*Licensing Corp. v. Rodriguez,* 83 USPQ2d at 1506; *In re Sears Roebuck & Co.,* 2 USPQ2d 1312, 1314 n.5 (TTAB 1987). While applicant has rightfully conceded that outerwear and undergarments are both clothing, they are different types of clothing, having different purposes. Therefore, opposer has the burden of showing that consumers will believe that outerwear and undergarments identified by similar marks come from a single source.

With respect to this likelihood of confusion factor, the case is long on argument and short on evidence. Of the 52 third-party registrations made of record by applicant, 8 of the registrations, owned by 7 different entities, are for clothing products that are identified in both opposer's registration and applicant's application.[27] The relevant third-party registrations are set forth below.[28]

---

[27] Applicant proffered the third-party registrations to explain the meaning of the word "fit" in connection with clothing and to show that opposer's mark ONE TRUE FIT is a weak mark. (Applicant's notice of reliance, p. 2). Opposer objected to the third-party registrations on the ground that they are not relevant because applicant failed to introduce any corroborating evidence that the marks are in use and therefore have any effect in the marketplace. (Opposer's Brief, Appendix, p. A6). Opposer's objection is overruled. While third-party registrations are not evidence that the marks are in use or that the public is familiar with them, registrations based on use in commerce may serve to suggest that the products listed in the registrations are of a type that may emanate from a single source. *In re Albert Trostel & Sons Co.,* 29 USPQ2d 1783, 1785-1786 (TTAB 1993); *In re Mucky Duck Mustard Co.,* 6 USPQ2d 1467, 1470 n.6 (TTAB 1988). Accordingly, the third-party registrations are admissible, and we may consider the third-party registrations for whatever probative value they may have.

[28] We have not included the entire description of goods for each of the registrations. Only the goods found in applicant's application and opposer's registration are listed. In addition,

| Mark | Reg. No. | Goods |
|------|----------|-------|
| WHAT A BEAUTIFUL FIT! | 2563469 | Clothing, namely, shirts, jackets, pants, and sleepwear |
| THERMA-F.I.T. | 1839775 | Clothing, namely, briefs, pants, and jackets |
| DAY FIT | 2438463 | Men and women's athletic apparel, namely, shorts, wind jackets, rain jackets, sports bras, t-shirts, sleeveless shirts; men and women's sportswear, namely, shorts, casual shirts, pants, coats, and jackets |
| FRENCH FIT | 2487084 | Women's maternity clothing, namely skirts, pants, shirts, lingerie, jackets, coats, shorts, and jeans |
| YOGA FIT and design | 2167784 | Clothing and wearing apparel, namely, shorts, sports bras, t-shirts, and jackets |
| A design mark | 3092786 | Men's, women's, children's and infants' active wear and casual clothing, namely, tops, t-shirts, capri pants, underwear, bras, panties, jackets, jeans, shorts, and skirts, |
| FLEX FIT and design | 1930765 | Clothing and clothing accessories, namely, tops, shirts, jackets, shorts, pants, and bras |
| DRI-FIT | 2571314 | Clothing, namely, jackets, skirts, sports bras, and underwear |

---

we note that Nike, Inc. owns both the DRI-FIT (Reg. No. 2571314) and THERMA-F.I.T. (Reg. No. 1839775) registrations.

Ms. Cahill testified that opposer and applicant are not competitors, and that intimate apparel is not related to jeans or pants, but could be related to tops.[29]

Q.  Would you say that intimate apparel is related to jeans?

A.  Not jeans, no.

Q.  What about pants?

A.  Not pants.

Q.  I'm sorry.

A.  Not pants.  I would say tops.[30]

In addition, Ms. Cahill and Ms. Skidmore both testified that the products were sold in different sections of department stores.[31]

The Board has previously found the use of identical marks for women's shoes, on the one hand, and women's clothing, namely, pants, blouses, shorts and jackets, on the other hand, is likely to cause confusion because the products are complementary.  *In re Melville Corp.,* 18 USPQ2d 1386, 1388 (TTAB 1991).

> A woman's ensemble, which may consist of
> a coordinated set of pants, a blouse and
> a jacket, is incomplete without a pair
> of shoes, which match or contrast
> therewith.  Such goods are frequently
> purchased in a single shopping
> expedition.  When shopping for shoes, a
> purchaser is usually looking for a shoe
> style or color to wear with a particular

---

[29] Cahill Dep., p. 232.
[30] *Id.*
[31] Cahill, Dep., pp. 233-234; Skidmore Dep., pp. 188-190.

> outfit. The items sold by applicant and registrant are considered complementary goods. They may be found in the same stores, albeit in different departments. We are convinced that this is a sufficient relationship between the goods to support a holding of likelihood of confusion where both sets of goods are sold under the same mark.

*In re Melville Corp.,* 18 USPQ2d at 1388.[32]

However, in this case, opposer's evidence that its outerwear is related to applicant's undergarments was not persuasive. Unlike in the *Melville* case, there is nothing in this record that allows us to conclude that women consider undergarments as part of an ensemble including coats, shorts, shirts, blazers, jackets, skirts, jeans, or pants, and that undergarments and outerwear are considered complementary products. Moreover, we find that the fact that the products of the parties are sold in different sections of department stores underscores their differences (*e.g.,* there is no evidence or testimony that, in the same shopping trip, women buy underwear to go with their jeans). In this case, the 8 third-party registrations are not particularly compelling evidence that the goods are related when balanced against the differences in the clothing

---

[32] It may be that women buy undergarments as part of an ensemble, or that they may purchase an undergarment because the cut of specific clothing requires a certain undergarment. However, opposer did not introduce any evidence, or make any argument, in that respect. While that may very well be the case, we will not take judicial notice of women's shopping practices. Therefore, opposer has the burden of showing how women shop for clothing,

products and Ms. Cahill's testimony that opposer and applicant are not competitors and that opposer's jeans and pants are not related to applicant's intimate apparel.[33]  In view of the foregoing, we find that the nature of the goods is a factor that favors finding that there is no likelihood of confusion.

B.   The similarity or dissimilarity of established, likely-to-continue trade channels and classes of consumers.

It is well settled that likelihood of confusion is determined on the basis of the goods as they are identified in the application and in the pleaded registrations. *Hewlett-Packard Co. v. Packard Press Inc.,* 281 F.3d 1261, 62 USPQ2d 1001, 1004 (Fed. Cir. 2002).  Because there is no limitation or restriction in the description of goods in the application and opposer's registration, the goods of the parties are presumed to travel in the same channels of trade to the same class of purchasers.  *Hewlett-Packard Co. v. Packard Press Inc.,* 62 USPQ2d at 1005.  *See also Octocom*

---

specifically undergarments, as part of its burden of proving that applicant's intimate apparel and opposer's outerwear are related.

[33] Although Ms. Cahill testified that tops may be related to applicant's intimate apparel, she did not explain what she meant by related, or why pants and jeans were not related, but tops were related to intimate apparel.  We are left with just a conclusion without any support or explanation.  In this regard, we note that opposer also sells camisoles.  However, as indicated above, it is not clear whether opposer labels camisoles with the ONE FAB FIT trademark.  In addition, because there is no evidence that any company other than opposer sells camisoles and other types of outerwear, it is not clear that consumers would expect that camisoles and outerwear emanate from a single source.

*Systems Inc. v. Houston Computer Services Inc.,* 918 F.2d 937, 16 USPQ2d 1783, 1787 (Fed. Cir. 1990).

In addition, the evidence of record demonstrates that the products in fact move in the same channels of trade and are sold to the same class of consumers. ONE TRUE FIT products are designed for women age 25-45.[34] Specifically, the products are for women whose "body shapes were changing as they matured, moving from a very straight kind of boy cut when they were in the junior section into a more womanly figure of having . . . hips widening out. . . . they were having trouble finding a fit that would make them still feel young and kind of contemporary."[35] Applicant's ONE FAB FIT undergarments are targeted for women 25 to 55 years old.[36]

ONE TRUE FIT products are sold nationwide,[37] "primarily in mid-tier channel, which would include retailers such as JCPenney, Kohl's, Sears, Goodys, Mervyns, as well as department stores. Most recently May Company which is now part of Federated. Belk, Bealls or Balls, as well as our own . . . E-commerce site and retailer E-commmerce sites."[38] ONE FAB FIT products are a mid-tier brand (*i.e.,* it is not a luxury brand, nor is it a low end brand).[39] The products

---

[34] Cahill Dep., pp. 18 and 165.
[35] Cahill Dep., p. 19.
[36] Skidmore Dep., p. 137.
[37] Cahill Dep., p. 28.
[38] Cahill Dep., pp. 27-28.
[39] Skidmore Dep., p. 137.

are sold in department stores, chain stores, independent specialty stores, and through applicant's website.[40] The department stores include Macy's, Bonton, Mervyn's, Belk, and JCPenney.[41] Chain stores include Kohl's, May Company (when it existed), and Lord & Taylor.[42] In fact, JCPenney, Bealls, and Amazon.com, as well as Mervyn's and May Company, sell both opposer's ONE TRUE FIT products and applicant's ONE FAB FIT products.[43]

In view of the foregoing, the channels of trade and classes of consumers are factors that favor finding that there is a likelihood of confusion.

C.    The conditions under which and buyers to whom sales are made (*i.e.,* "impulse" vs. careful, sophisticated purchasing).

Opposer argued, "[c]lothing is generally regarded as an item which consumers buy without a great deal of care or forethought."[44] On the other hand, applicant argued, "[c]onsumers of branded apparel and especially intimate apparel are very sophisticated in making their purchasing decisions."[45] According to applicant, the relevant purchasers in this case "do not include the general public but rather a set of sophisticated female and brand conscious

---

[40] Skidmore Dep., p. 20.
[41] Skidmore Dep., p. 133.
[42] Skidmore Dep., p. 133.
[43] Cahill Dep., pp. 169-170.
[44] Opposer's Brief, p. 23.
[45] Applicant's Brief, p. 24.

female consumers who are extremely careful in selecting such a personal intimate item."[46]

Even assuming, *arguendo*, that customers for applicant's intimate apparel, and for opposer's outerwear, exercise a high degree of care, applicant does not provide any evidence regarding the decision process used by these careful and sophisticated purchasers, the role trademarks play in their decision making process, or how observant and discriminating they are in practice. On the other hand, opposer fails to present evidence regarding how the presumably ordinary clothing consumers will react to the ONE FAB FIT mark used in connection with bras, panties, and camisoles, especially in light of the purported strength of the ONE TRUE FIT mark. Accordingly, the problem with "degree of consumer care" argument made by both parties is that there is no corroborating evidence and it is inconsistent with the description of goods in the application and registration (*i.e.,* not all of the potential consumers for outerwear and under garments are sophisticated consumers).

In determining the conditions under which the products at issue are sold and the consumers who buy them, we note there are no restrictions or limitations in the description

---

[46] Applicant's Brief, p. 24. As indicated above, applicant's targeted consumer is a woman, age 25-55, looking for a mid-tier brand, and opposer's targeted consumer is a woman, age 25-45, who is looking for stylish clothing that fits properly.

of goods in either the application or opposer's registration. Therefore, the clothing products of both parties may be inexpensive and bought by ordinary consumers. *See In re Bercut-Vandervoort & Co.,* 229 USPQ 763, 764 (TTAB 1986) (evidence that relevant goods are expensive wines sold to discriminating purchasers must be disregarded given the absence of any such restrictions in the application or registration). In view thereof, the conditions under which and buyers to whom sales are made are factors that favor opposer.

D.   The market strength of opposer's ONE TRUE FIT mark.

Opposer argued that its ONE TRUE FIT mark is entitled to a "large cloak of protection" because of its substantial sales, national advertising, and unsolicited media attention.[47] However, ONE TRUE FIT is one of opposer's sub-brands (*i.e.,* a product line aimed at a specific target group), and it is never used as a stand-alone mark. In other words, it is never used without the LEE trademark.[48] In all of the exhibits, LEE is the dominant trademark. Consumers do not have an opportunity to disassociate ONE TRUE FIT from the more prominent LEE trademark. It is incumbent on opposer to produce evidence that product marks can properly be seen as independent of its associated house

---

[47] Opposer's Brief, pp. 12-16.
[48] Cahill Dep., pp. 175-178.

mark.  *See Bose Corp. v. QSC Audio Products Inc.,* 293 F.3d 1367, 63 USPQ2d 1303, 1306-1307 (Fed. Cir. 2002) ("those who claim fame for product marks that are used in tandem with a famous house mark can properly be put to tests to assure their entitlement to the benefits of fame for product marks").  In this case, there is no evidence from which to infer from opposer's advertising expenses and revenues the extent to which consumers recognize the ONE TRUE FIT mark standing alone and outside the context of the LEE trademark.

Also, the numerous news and magazine articles of record that reference ONE TRUE FIT are of little probative value in determining the public recognition of the mark.  First, most of the publications are specialty or business magazines (*e.g., Women's Wear Daily, Brandweek, Promo, Advertising Age, etc.*).  There is no explanation regarding how articles referencing ONE TRUE FIT in these publications demonstrate recognition of the brand by relevant consumers.  Second, many of the articles discuss how opposer will be introducing the brand or make other passing references but do not otherwise evidence widespread public recognition of the ONE TRUE FIT mark.

Finally, as discussed more fully below, ONE TRUE FIT has a suggestive connotation.  Suggestive marks, in general, are not entitled to the same scope of protection as arbitrary marks.  *Kenner Parker Toys, Inc. v. Rose Art*

*Industries, Inc.,* 963 F.2d 350, 22 USPQ2d 1453, 1456 (Fed. Cir. 1992), *quoting Sure-Fit Products Co. v. Saltzon Drapery Co.,* 254 F.2d 158, 117 USPQ 295, 296 (CCPA 1958) ("where a party chooses a trademark which is inherently weak, he will not enjoy the wide latitude of protection afforded the owners of strong trademarks. Where a party uses a weak mark, his competitors may come closer to his mark than would be the case with a strong mark without violating his rights"); *Milwaukee Nut Co. v. Brewster Food Service,* 277 F.2d 190, 125 USPQ 399, 401 (CCPA 1960) (by selecting a suggestive mark, plaintiff was not entitled to same scope of protection afforded an arbitrary mark); *In re Lar Mor International, Inc.,* 221 USPQ 180, 182 (TTAB 1983). Because opposer's mark is suggestive, the evidence of its renown or marketplace strength has to be more unequivocal than opposer has shown in this case.

Based on this record, opposer has failed to demonstrate that ONE TRUE FIT should be accorded a broad scope of protection because it is a widely recognized trademark.

E. <u>The similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression</u>.

We now turn to the *du Pont* likelihood of confusion factor focusing on the similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression. *In re E. I. du Pont*

30

*De Nemours & Co.,* 177 USPQ at 567. In a particular case, any one of these means of comparison may be critical in finding the marks to be similar. *In re White Swan Ltd.,* 9 USPQ2d 1534, 1535 (TTAB 1988); *In re Lamson Oil Co.,* 6 USPQ2d 1041, 1042 (TTAB 1988). In comparing the marks, we are mindful that the test is not whether the marks can be distinguished when subjected to a side-by-side comparison, but rather whether the marks are sufficiently similar in terms of their overall commercial impression so that confusion as to the source of the goods offered under the respective marks is likely to result. *San Fernando Electric Mfg. Co. v. JFD Electronics Components Corp.,* 565 F.2d 683, 196 USPQ 1, 3 (CCPA 1977); *Spoons Restaurants Inc. v. Morrison Inc.,* 23 USPQ2d 1735, 1741 (TTAB 1991), *aff'd unpublished,* No. 92-1086 (Fed. Cir. June 5, 1992). The proper focus is on the recollection of the average customer, who retains a general rather than specific impression of the marks. *Winnebago Industries, Inc. v. Oliver & Winston, Inc.,* 207 USPQ 335, 344 (TTAB 1980); *Sealed Air Corp. v. Scott Paper Co.,* 190 USPQ 106, 108 (TTAB 1975).

In terms of appearance and sound, the marks are similar to the extent that they share the same structure. The marks share the following features:

1.  They are three, single syllable words;

2.  They begin with the word "one";

3. They end with the word "fit"; and,

4. The middle word in each mark is a laudatory adjective.

Moreover, there is no evidence that any other mark has been registered (or used) with the same structure as opposer's mark other than applicant's mark.[49] In fact, there are only two registrations consisting of both the words "one" and fit":

1. Registration No. 2915957 for the mark ONE FIT for clothing, namely, headwear; and,

2. Registration No. 1930819 for the mark ONE SIZE FITS MOST for men's, women's, and children's sleepwear, loungewear, slippers, robes, and lingerie.

However, opposer's mark is highly suggestive of a feature of the outerwear. In this regard, we note the dictionary definitions submitted by the applicant in its notice of reliance. The word "one" means "a single unit or entity" or "an indefinitely specified thing or person." The word "fit" means "to be the correct size and shape." The word "true" has several meanings including "consistent with reality or fact," "real: genuine," and "precisely: accurately." Accordingly, opposer's mark ONE TRUE FIT literally means the most correct or accurate fit. Opposer

---

[49] Applicant's notice of reliance, Exhibits 2-53.

adopted ONE TRUE FIT because "[i]t meant that this was their [the consumers'] one true fit, this was something that would fit into their lives, it would fit into their personalities, their style.  We understand the individual needs."[50]

> Q. Let's talk about the One True Fit, what that conveys to the consumer.  What does true mean?
>
> A. True means it's the kind of ultimate – it's your perfect, your perfect, and true also gives a feeling of honesty that you can trust.
>
> Q. So you want the consumer to understand that true means a trusted fit?
>
> A. A trusted, a perfect, a - - you know, your ultimate - - your ultimate fit.
>
> Q. And what about fit; what does that mean in connection with the mark One True Fit?  What does that mean to consumers?
>
> A. Well, fit can mean a lot of things to consumers.  And that's one of the reasons it can have an emotive meaning.  It can fit into your lifestyle, fit into your mood, fit into your personality.  And it can also be a very literal translation of how it fits your body.  So we have - - we feel it's a double entendre, that it can be used both ways, both emotive, to convey how it fits within your lifestyle, as well as how it literally fits your body.
>
> \*    \*    \*    \*
>
> A. Our understanding of how consumers, how they perceive the word "fit," is there is a rational message of how fits your body, as well as an emotive translation or definition of how fits your lifestyle, your mood, your personality, your style.  That is our understanding of what consumers think of fit.

---

[50] Cahill Dep., p. 198.

> Q.  What about the term "one" in the brand One True Fit, what does the term "one" convey?
>
> A.  One conveys the individual aspects, that it's something made personal, specific for them.[51]

There is one registration with the term "true fit": Registration No. 2567053 for the mark TRUE FIT TRY ON for disposable panties and face masks for use in trying on clothing and swimwear.  In this registration the use of the term "true fit" appears to mean "an accurate fit."

On the other hand, ONE FAB FIT literally means a wonderful or spectacular fit.  The word "fab"[52] is an abbreviation for the word "fabulous" which means "1.  almost impossible to believe; incredible:  2.  *Informal.* exceptionally good or unusual; marvelous; superb."[53] Applicant adopted the mark ONE FAB FIT because "fab" means "fantastic."[54]  While ONE FAB FIT and ONE TRUE FIT may have a somewhat similar meaning, there is a difference in nuance that creates a different commercial impression (*i.e.,* ONE TRUE FIT is formal whereas ONE FAB FIT is more informal and slangy).  *See In re British Bulldog, Ltd.,* 224 USPQ 854 (TTAB 1984) (no likelihood of confusion found between

---

[51] Cahill Dep., pp. 209-214.
[52] The Random House Dictionary of the English Language (Unabridged), p. 689 (2nd ed. 1987).  The Board may take judicial notice of dictionary evidence.  *University of Notre Dame du Lac v. J.C. Gourmet Food Imports Co.,* 213 USPQ 594 (TTAB 1982), *aff'd,* 703 F.2d 1372, 217 USPQ 505 (Fed. Cir. 1983).
[53] *Id.*
[54] Skidmore Dep., pp. 19-20.

PLAYERS in stylized form for men's underwear and PLAYERS for shoes, based in part on the different connotations the marks have when used in connection with the respective goods); *In re Sydel Lingerie Co., Inc.,* 197 USPQ 629 (TTAB 1977) (no likelihood of confusion found between BOTTOMS UP for ladies' and children's underwear and BOTTOMS UP for men's suits, coats and trousers).

In view of the highly suggestive nature of opposer's mark ONE TRUE FIT, we find that the visual and aural differences and particularly the difference in the commercial impression, resulting from applicant's use of the word "fab "instead of "true" outweigh whatever similarities there may be in appearance, sound, and meaning. For these reasons, we find that opposer's mark and applicant's mark are dissimilar when viewed in their entireties.

F.   Balancing the factors.

In weighing the highly suggestive nature of the marks, the dissimilarity of the marks, and of the types of clothing on which the marks are used against the similarity of the trade channels, we find that applicant's use of the mark ONE FAB FIT for "foundation garments, panties, brassieres, underwear, briefs, body briefers, body suits, shapewear, girdles, camisoles, women's undergarments, and women's intimate apparel namely, sleepwear, lingerie, and slippers" will not be likely to cause confusion with opposer's mark

35

ONE TRUE FIT for "clothing, namely, non-leather coats, shorts, shirts, blazers, non-leather jackets, skirts, jeans, and pants."

Decision:  The opposition is dismissed with prejudice.


Rogers, Administrative Trademark Judge, concurring:

I concur entirely in the majority decision.  I note, however, that the opposer's claim of priority and likelihood of confusion under Section 2(d) of the Trademark Act was ably tried, although successfully defended by applicant, without either party having received discovery responses from the other.  Many Board cases could similarly be effectively tried with limited or no discovery, yielding the involved parties significant savings in time and money.[55]

To be clear, both parties in this case served discovery requests, but neither party ever responded to the requests. And apart from an untimely motion to compel filed by opposer, neither party filed a motion relating to discovery. Thus, pre-trial activity was extremely limited.

Inter partes Board cases commenced on or after November 1, 2007 proceed under amended Trademark Rules ("new rules") which, inter alia, require parties to make certain initial disclosures, expert disclosures and pretrial disclosures.

---

[55] "The parties may stipulate to a shortening of the discovery period."  Trademark Rule 2.120(a)(2), 37 C.F.R. § 2.120(a)(2).

This case, however, proceeded under the former rules, which required no disclosures.  The fact that this case was tried and defended without either disclosures or discovery responses places it in stark contrast to the many Board cases in which traditional discovery processes have often only unnecessarily complicated proceedings.

All too often in Board cases, information that is clearly relevant to a claim or defense and which should be freely shared, preferably through voluntary disclosures or informal proffers of proof, is instead left to languish in the shadows.  It is brought out by a party into the light of day only when an adverse party asks the right question, at the right time, in the right way, i.e., serves the "right" discovery request.  Even then, a typical "response" may only involve a promise to look in the shadows of the file room and, *if* anything is found, to produce it at some unspecified time in the future.

Certainly, it is not unusual for a party to serve unbridled and far-reaching discovery requests simply because the Trademark Rules and Federal Rules of Civil Procedure allow the practice.  The motivation may be delay or to run up the costs of the proceeding, but whatever the motivation often far more "discoverable" information and documents are sought than are truly necessary for a party to advance a claim or defense or counter an adverse party's claim or

defense. It may, therefore, be understandable that a party receiving a set of burdensome discovery requests might choose to present curt, limited responses. The result, however, is a vicious circle that, once entered, is difficult to exit.

It appears that the parties to this case initially did not respond to discovery requests because they thought settlement (always encouraged) was possible and that responses would not be necessary. Why the parties did not pursue responses when it became clear that settlement was out of reach and before the case entered its trial phase is not clear. Nonetheless, it is clear that *the absence of discovery responses* caused no significant prejudice to either party's ability to marshal support for the claim or defense it had the responsibility to support and prove.

In briefing the case, applicant's counsel argued at some length why much of opposer's evidence should be excluded. The majority opinion's thorough discussion of the argument needs no repeating. The fact remains, however, that little, if any, of the evidence the opposer produced at trial could fairly be said to have been unexpected in a case involving a Section 2(d) claim. Indeed, applicant's vociferous, though unavailing, argument for application of the estoppel sanction seems much more rooted in an attempt to wrest a procedural advantage that would have prevented

38

opposer from proving its case, than in an attempt to keep out of the record evidence of questionable reliability or probative value. As for opposer, it objected to applicant's evidence regarding the ONE FABULOUS FIT mark that applicant tried to tack onto the involved ONE FAB FIT mark. This objection, however, is not so much an objection rooted in failure to provide information about the former mark during discovery as it is an objection to inadequate pleading. Had applicant pleaded an affirmative defense of priority through tacking, opposer could not have argued unfair surprise.

None of these comments or observations should be taken as an assertion that there is no place for discovery in a Board proceeding. Indeed, the notice of rulemaking for the "new rules" specifically contemplates a role for discovery as well as disclosures in Board proceedings. However, if a Board proceeding is to present parties an opportunity to obtain adjudication of the limited questions relating to their marks that are within the Board's jurisdiction, without the expenditure of resources that often accompanies entry into a district court, then parties must accept that discovery practice in Board proceedings can and should be rather limited and focused. As this case illustrates, even without discovery from one's adversary, one can still try or defend a Board case.